# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Anderson*, 2013 IL App (2d) 111183

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. PATRICK J. ANDERSON, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-11-1183 |
| Filed | June 27, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction for unlawful delivery of a controlled substance was upheld over his contentions that the chain of possession of the heroin was not established and that his counsel was ineffective in failing to object to the evidence that he had an outstanding warrant and a prior conviction for the same offense and in failing to file a motion for severance, since the trial court did not abuse its discretion in finding that a *prima facie* showing was established, especially in view of the reasonable measures taken by the police to protect the evidence, the evidence of defendant's guilt was overwhelming, defense counsel's course of action was a matter of trial strategy, and the failure to seek to sever the drug charge from an accompanying weapons charge did not prejudice defendant. |
| Decision Under Review | Appeal from the Circuit Court of McHenry County, No. 10-CF-1150; the Hon. Joseph P. Condon, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal          Thomas A. Lilien and Paul Alexander Rogers, both of State Appellate Defender's Office, of Elgin, for appellant.

Louis A. Bianchi, State's Attorney, of Woodstock (Lawrence M. Bauer and Diane L. Campbell, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Panel          PRESIDING JUSTICE BURKE delivered the judgment of the court, with opinion.

Justices McLaren and Birkett concurred in the judgment and opinion.

## OPINION

¶ 1      A jury found defendant, Patrick J. Anderson, guilty of unlawful delivery of less than one gram of heroin (see 720 ILCS 570/401(d) (West 2010)) and attempted unlawful possession of a firearm by a felon (see 720 ILCS 5/8-4, 24-1.1 (West 2010)). Defendant was arrested after delivering heroin to an undercover officer in exchange for a firearm and ammunition.

¶ 2      On appeal, defendant does not challenge the weapon conviction, but rather argues that he is entitled to a new trial on the charge of unlawful delivery of heroin. First, defendant contends that the State failed to establish a sufficient chain of custody for the heroin. Second, defendant contends that defense counsel rendered ineffective assistance by failing to object to evidence that defendant had an outstanding arrest warrant at the time of the offense and by allowing the jury to learn that defendant's prior felony conviction was of unlawful possession of a controlled substance. We affirm.

¶ 3                              I. FACTS

¶ 4      At trial, Special Agent Andy Shiu testified that he is a Lake Forest police officer assigned to a multidepartmental drug task force known as the Metropolitan Enforcement Group (MEG). On October 28, 2010, Agent Shiu had three telephone conversations with a man after obtaining his phone number from a confidential informant. During the conversations, Agent Shiu told the man that he was interested in buying heroin and using one of his family's guns to pay for the drugs. The man said that he was in "legal trouble" and would exchange some heroin for a gun. Agent Shiu and the man arranged to meet that day, but the meeting did not occur.

¶ 5      Without objection by defense counsel, Agent Shiu testified that, on the date of defendant's arrest, he knew that defendant had an outstanding arrest warrant in McHenry County. On cross-examination, defense counsel elicited testimony that Agent Shiu knew that

the arrest warrant was also active on the date of his first attempted meeting with the man.

¶ 6    Agent Shiu testified that, on November 3, 2010, he had more telephone conversations with the seller. They arranged to meet in Lake County that evening. Dressed in civilian clothing, Agent Shiu drove alone in an unmarked car to the location. While waiting, Agent Shiu again spoke to the man, who asked Agent Shiu to meet him at a different location, in McHenry County. Agent Shiu drove to the location, followed by a surveillance team of MEG agents.

¶ 7    At 8:45 p.m., Agent Shiu reached the location and was met by defendant. Defendant walked to Agent Shiu's car and entered on the front passenger side. Defendant reached into his coat pocket, pulled out a knotted baggie containing what Agent Shiu believed to be a small amount of heroin, and handed the baggie to Agent Shiu. Although it was "relatively dark" in the car, the dashboard provided enough light for Agent Shiu to see that the baggie was clear plastic. Agent Shiu held the baggie but did not open it to inspect its contents.

¶ 8    Agent Shiu testified that he began counting out some money, but, before handing defendant the money, Agent Shiu retrieved from the rear seat a zippered pouch. The pouch contained a semi-automatic pistol, a magazine for the pistol, and some loose bullets. The ammunition did not match the firearm. Agent Shiu opened the pouch and showed the gun to defendant. Defendant told Agent Shiu that, in exchange for the gun, Agent Shiu could keep the heroin that defendant had brought and that defendant would deliver twice as much the next day. Defendant held the gun but only for about 30 seconds.

¶ 9    Agent Shiu testified that he pressed the car's brake pedal to signal the MEG agents to move in and arrest defendant. Defendant started exiting the car just as the agents opened his door. Some of the agents took defendant into custody, while others pretended to arrest Agent Shiu to maintain the ruse. Some of the agents placed Agent Shiu face down on the pavement. Meanwhile, defendant was handcuffed, placed in an MEG car, and removed from the scene.

¶ 10   After defendant was removed, another MEG agent handed Agent Shiu a clear plastic knotted baggie. Agent Shiu could not recall the agent's name, and his report did not mention it either. Agent Shiu did not open the baggie. However, Agent Shiu testified that the baggie was the same one he received from defendant.

¶ 11   Agent Shiu testified that, when the agents pretended to arrest him, the baggie he received from defendant was sitting on the dashboard. Agent Shiu did not know who recovered the baggie from the dashboard, but he stated that only MEG agents were at the scene. Agent Shiu returned to the car and found the pouch containing the gun and other items. Agent Shiu gave the pouch and the baggie to Detective Kyle Mandernack, another MEG agent.

¶ 12   Detective Mandernack testified that, 10 to 15 minutes after defendant's arrest, he walked to Agent Shiu's car, where Agent Shiu handed Detective Mandernack the gun, the ammunition, the pouch, and the baggie. Detective Mandernack estimated that there were eight other MEG agents on the scene during that 10- to 15-minute period. Detective Mandernack described the baggie as clear plastic, knotted at the opening, with a white powder inside. Detective Mandernack and Sara Anderson, a forensic scientist with the Illinois State Police laboratory, offered additional testimony about the processing of the baggie's contents, which tested positive for heroin.

¶ 13    The envelope containing the plastic bag and the heroin was admitted into evidence over defense counsel's objection. Counsel argued that the exhibit was inadmissible because the testimony showed a "broken chain of [custody of the] evidence." Specifically, counsel asserted that the baggie that defendant gave to Agent Shiu had been out of the agent's sight for several minutes and accessible to other unidentified agents before an unidentified agent returned a baggie to Agent Shiu at the scene. The trial court found that "[t]here is evidence it's the same plastic bag. [Agent] Shiu testified the bags were the same."

¶ 14    The trial court also admitted and published to the jury a certified copy of defendant's 2005 felony conviction of unlawful possession of a controlled substance. Defense counsel did not object.

¶ 15    During closing argument, defense counsel reminded the jury that the police had an outstanding arrest warrant for defendant before Agent Shiu arranged the undercover transaction leading to the charges in the case. Counsel also told the jury that the police had evidence that defendant had a criminal record and was addicted to heroin. The State objected that the comment about addiction referred to facts not in evidence, and the trial court sustained the objection.

¶ 16    Over defense counsel's objection, the trial court instructed the jury that a person commits unlawful possession of a firearm by a felon when he knowingly possesses a firearm "having been convicted of unlawful possession of a controlled substance." Defense counsel argued unsuccessfully that, by referring to actual possession of a firearm rather than to attempted possession, the instruction improperly referred to an uncharged offense. Defense counsel did not object to the instruction on the ground that it disclosed the name and nature of defendant's prior conviction. The jury found defendant guilty of unlawful delivery of less than one gram of heroin (see 720 ILCS 570/401(d) (West 2010)) and attempted unlawful possession of a firearm by a felon (see 720 ILCS 5/8-4, 24-1.1 (West 2010)).

¶ 17    Defense counsel filed a posttrial motion arguing that the heroin was inadmissible because the State failed to establish a sufficient chain of custody and show that it was in the same condition when tested as when it was recovered at the scene.

¶ 18    Before the posttrial motion was heard, defense counsel was allowed to withdraw due to a conflict with defendant. The court appointed a new attorney who amended the posttrial motion, alleging that the chain of custody was deficient because Agent Shiu testified that the baggie he received from defendant was knotted but Anderson testified that the baggie she received had not been knotted. The trial court denied the motion and sentenced defendant to 360 days in jail for attempted unlawful possession of a firearm by a felon (see 720 ILCS 5/8-4, 24-1.1 (West 2010)) and 6 years' imprisonment for unlawful delivery of less than one gram of heroin (see 720 ILCS 570/401(d) (West 2010)).

¶ 19                                    II. ANALYSIS
¶ 20                                 A. Chain of Custody
¶ 21    On appeal, defendant argues that the trial court abused its discretion in admitting People's Exhibit 3, which was the evidence envelope containing the baggie of heroin, because the State failed to establish a sufficient chain of custody. There is no dispute that the

-4-

State did not present evidence to identify every custodian in the chain leading from the seizure of the drugs by Agent Shiu to their receipt by Anderson.

¶ 22    To convict a defendant of unlawful delivery of a controlled substance, the State must prove that the material recovered from the defendant is in fact a controlled substance. *Cf. People v. Woods*, 214 Ill. 2d 455, 466 (2005) (unlawful possession). In narcotics cases, in which the physical evidence is often not readily identifiable or may be susceptible to tampering, contamination, or exchange, the State must establish a chain of custody. *Woods*, 214 Ill. 2d at 467. The State establishes a *prima facie* showing of a sufficient chain of custody for narcotics by establishing that reasonable protective measures were taken to ensure that the evidence was not tampered with, substituted, or altered between the time of seizure and the forensic testing. *Woods*, 214 Ill. 2d at 468. Once the State makes its *prima facie* showing, the burden shifts to the defendant to produce evidence of actual tampering, alteration, or substitution. If the defendant presents such evidence, the burden shifts back to the State to rebut the defendant's claim. *Woods*, 214 Ill. 2d at 468. The defendant is not required to show actual tampering, alteration, or substitution unless the State first establishes its *prima facie* showing that it is improbable that the evidence was compromised. *Woods*, 214 Ill. 2d at 468. The State need not exclude every possibility of contamination but rather must show only that it took reasonable protective measures after the evidence was seized and that it is unlikely that the evidence was contaminated. *People v. Lundy*, 334 Ill. App. 3d 819, 826 (2002). When reviewing the trial court's ruling on the sufficiency of a chain of custody, a court of review will reverse the trial court's ruling only upon finding abuse of discretion. *People v. Howard*, 387 Ill. App. 3d 997, 1004 (2009).

¶ 23    We point out that tampering, alteration, or substitution of seized narcotics can affect the quality of the substance, the quantity of the substance, or both. Here, defendant challenges his conviction of unlawful delivery of *less than one gram* of heroin (see 720 ILCS 570/401(d) (West 2010)). Based on the charged weight of the substance, under the statute defendant was subject to the least severe penalty for delivery of the drug. Thus, even if the substance seized from defendant was somehow altered, he could not have been prejudiced by a change in weight. In other words, any alteration causing the substance to weigh more did not result in a sentencing enhancement based on weight. Defendant's challenge to the sufficiency of the chain of custody necessarily is limited to the possibility that the police substituted heroin for something else that was in the baggie.

¶ 24    We conclude that the trial court did not abuse its discretion in ruling that the prosecution had established a *prima facie* showing of the chain of custody. As defendant produced no evidence of actual tampering, alteration, or substitution, the prosecution was not required to present the testimony of every person in the chain or to exclude every possibility of contamination. The court did not abuse its discretion in finding that the State took reasonable protective measures and that contamination of the evidence was unlikely.

¶ 25                              1. At the Scene

¶ 26    Defendant identifies two gaps in the chain of custody. First, defendant asserts that there was no evidence of what happened to the baggie from when Agent Shiu placed it on the

dashboard of his car to when it was returned to him at the scene after defendant had been taken into custody. Defendant argues that the State was required to identify who recovered the baggie from the dashboard and to show what, if anything, happened to the baggie before it was returned to Agent Shiu.

¶ 27    At trial, Agent Shiu testified that, after defendant entered the car, defendant handed him a baggie, which had a knot at the top and appeared to be clear. Agent Shiu placed the baggie on the dashboard, where it was sitting when Agent Shiu and defendant were removed from the car. Within 10 to 15 minutes, the baggie was returned to Agent Shiu, who in turn handed it to Detective Mandernack.

¶ 28    Although Agent Shiu could not identify which agent recovered the baggie from the dashboard or returned the baggie to him after the arrest, he testified that the baggie he received after the arrest was the same one defendant had given him. Agent Shiu testified that the baggie was knotted both when defendant delivered it and when it was returned to Agent Shiu following the arrest. Agent Shiu testified that he held the baggie before and after the arrest, which gave him the opportunity to assess its weight and conclude that its weight did not change. If the unidentified agent had given the baggie to Detective Mandernack, Agent Shiu could not have testified to the integrity of the baggie. However, because the baggie was returned to Agent Shiu, he could testify that it was ostensibly intact and was the same baggie that was delivered by defendant. Detective Mandernack testified that Agent Shiu gave him the knotted baggie 10 to 15 minutes after defendant's arrest. Detective Mandernack estimated that there were eight other MEG agents on the scene during that period, and Agent Shiu testified that only MEG agents were at the scene. The State presented evidence that the scene was secure in that Detective Mandernack also testified that he was directing traffic while the other agents completed the investigation. The gap in the chain of custody alleged by defendant was short in duration, and it involved a small number of agents who did not remove the baggie from the scene.

¶ 29    Certainly, the better course would have been for the State to present the testimony of the agent or agents who retrieved the baggie from the car and returned it to Agent Shiu. However, our deferential standard of review compels us to conclude that the trial court did not commit reversible error. The court did not abuse its discretion in ruling that the prosecution demonstrated that reasonable measures were employed to protect the evidence after it was recovered from the car and that it was unlikely that the evidence had been altered. See *Woods*, 214 Ill. 2d at 467. The gap that defendant alleges amounts only to an opportunity for speculation about events in which the integrity of the evidence could possibly have been compromised. See *People v. Blankenship*, 406 Ill. App. 3d 578, 595 (2010). We view this alleged gap as going to the weight of the evidence rather than to its admissibility. See *People v. Williams*, 238 Ill. 2d 125, 150 (2010); *Woods*, 214 Ill. 2d at 467. The trial court found Agent Shiu and Detective Mandernack to be credible and admitted the exhibit accordingly.

¶ 30                                    2. Evidence Locker

¶ 31    The second alleged gap in the chain of custody occurred after the evidence envelope arrived at the McHenry County sheriff's department. Defendant asserts that the State failed

to establish a *prima facie* showing of the chain of custody because there was no evidence of what happened to the baggie from when Detective Mandernack placed it in the evidence locker to when Anderson tested it. Defendant claims that the prosecution was required to identify who had access to the evidence locker and how the sealed envelope containing the baggie was transported from the locker to the lab for testing. We disagree.

¶ 32      Detective Mandernack testified that he field tested the substance that was inside the baggie at the scene, placed the baggie with the substance into an envelope, and placed the envelope in an evidence locker at the McHenry County sheriff's department so an evidence technician could take it to the lab for testing. Detective Mandernack identified People's Exhibit 3 as the envelope into which he placed the baggie. Detective Mandernack testified that he had written on the front of the envelope and that he recognized his writing on People's Exhibit 3. The back of the exhibit also bore his initials and identification number. Detective Mandernack testified that he used red tape to seal the envelope that the envelope remained sealed until it was sent to the crime lab.

¶ 33      On cross-examination, Detective Mandernack was asked whether he could identify the evidence technician who delivered the envelope to the lab. The State objected on the ground that the question was beyond the scope of direct examination, and the trial court sustained the objection.

¶ 34      Anderson testified that she tested the contents of the baggie. Anderson recognized People's Exhibit 3 as a sealed envelope that she had received at the lab. The "paperwork" accompanying the envelope showed the "submitting agency" to be the McHenry County sheriff's department, but Anderson did not say when, how, or by whom the envelope had been delivered to the lab. Anderson also did not identify the lab employee who had received the envelope or which employees had access to it in the lab.

¶ 35      Anderson testified that she had opened the envelope without breaking the seal, using a pair of scissors to open the other end of the envelope. Inside the envelope was a plastic baggie containing "a rock of powder" that weighed three-tenths of a gram. Various tests showed that the powder was heroin.

¶ 36      After the testing, Anderson placed the baggie with the heroin into a Ziploc bag and placed the Ziploc bag into the original evidence envelope. Anderson resealed the envelope, which was picked up from the lab by someone from the McHenry County sheriff's department about two months later. Both the original seal and Anderson's seal were still on the envelope when she saw the exhibit at trial.

¶ 37      " '[W]hen no positive evidence of tampering or other contamination exists, the proponent of the evidence can replace a missing link, created when one or more custodians of the evidence do not testify, with evidence (1) that the evidence left the hands of one testifying custodian in a sealed envelope or other container and arrived in the hands of the next testifying custodian still in a sealed container, and (2) that the identifying number or code on the container sent out matches that on the container received.' " *People v. Blankenship*, 406 Ill. App. 3d 578, 588-89 ( 2010) (quoting *People v. Johnson*, 361 Ill. App. 3d 430, 441-42 (2005)). Considering the absence of evidence of tampering or other contamination, the State properly filled the gap in the chain of custody through Detective Mandernack's testimony

regarding the seal and the identifier he placed on the evidence envelope and Anderson's testimony that the envelope still was sealed when she received it.

¶ 38 In challenging the chain of custody, defendant relies upon *People v. Whirl*, 351 Ill. App. 3d 464 (2004), *People v. Moore*, 335 Ill. App. 3d 616 (2002), and *People v. Howard*, 387 Ill. App. 3d 997 (2009), but those cases do not compel reversal here. In *Whirl*, a sheriff's deputy testified that he searched Whirl when he was brought to the jail. The deputy saw that Whirl had something in his mouth. Whirl said that it was gum and spit something into a garbage can. During a second search of his mouth, Whirl eventually spit out "another pack." The deputy testified that he recovered drugs in "two packs," which he described as two black baggies. The deputy gave the baggies to unidentified transporting officers, and he assumed that the baggies were submitted to the crime lab for testing. The baggies were not introduced into evidence, but the deputy identified them in a photographic exhibit. According to the deputy, the photograph showed the baggies as they appeared on the date of Whirl's arrest. *Whirl*, 351 Ill. App. 3d at 469-70.

¶ 39 On appeal to this court, Whirl successfully challenged the chain of custody of the drugs. We stated that, although the deputy testified that he recovered "two packs" of drugs and that Whirl spit out one packet during the second search of his mouth, there was no evidence of when and where the other pack was found. The deputy gave these items to transport officers who were not identified. The parties stipulated that a forensic scientist would testify that she received two black baggies from the police department, but, again, there was no delivering officer identified or time specified. The deputy testified that the photograph showed the baggies as they appeared on the night they were recovered, but there was no evidence as to how the second baggie was found, the length of time it was unaccounted for before it was found, who handled the baggies between the time the officer turned them over to the transport officers and the time the baggies were delivered to the crime lab, when the baggies were delivered to the crime lab, and which baggie tested positive for cocaine. *Whirl*, 351 Ill. App. 3d at 471. Noting that *all* of this evidence might not have been required, we held that, because *none* of this evidence was provided, the State failed to establish a *prima facie* showing of a sufficient chain of custody. We concluded that the chain was "missing too many links." *Whirl*, 351 Ill. App. 3d at 471.

¶ 40 This case does not present nearly as many missing links as *Whirl* did. Unlike in *Whirl*, the State presented evidence that only one baggie of drugs originated from defendant and that Agent Shiu took possession of it. To the extent that the State's case suffered from a gap in the chain of custody, the gap was filled by Detective Mandernack's testimony that he placed a seal and wrote his name and identification number on the evidence envelope and Anderson's testimony that the envelope still was sealed when she received it.

¶ 41 In *Moore*, the codefendants were tried jointly on charges of delivery of a controlled substance. A police officer testified that he was working undercover when he purchased crack cocaine from the codefendants in an alley. Specifically, Moore removed from his mouth a clear plastic bag containing a substance, which the officer suspected to be crack cocaine, and handed it to the officer in exchange for a $10 bill. *Moore*, 335 Ill. App. 3d at 618-19. When asked if he inventoried the item he received from Moore, the officer replied "yes." No further testimony was elicited about the chain of custody of the contraband, but

-8-

the prosecutor offered a stipulation that "the chain of custody is in tact [*sic*]" and that a forensic scientist would testify that she analyzed the substance and found it to be 0.1 grams of cocaine. *Moore*, 335 Ill. App. 3d at 619. Defense counsel agreed to stipulate only that the substance that was inventoried tested positive for cocaine. *Moore*, 335 Ill. App. 3d at 619.

¶ 42    Under these facts, the *Moore* court concluded that defense counsel did not intend to stipulate to the chain of custody of the contraband from the undercover police officer to the crime laboratory. *Moore*, 335 Ill. App. 3d at 621. The court also held that the State failed to make a *prima facie* showing of a sufficient chain of custody. *Moore*, 335 Ill. App. 3d at 622. The State did not present any evidence detailing what procedures, if any, the undercover officer employed concerning the handling and safekeeping of the evidence between his recovery of the plastic bag and its receipt by the State's forensic scientist. For instance, there was no testimony that the officer transported the evidence to the police station and assigned it an inventory number. Rather, the officer testified merely that he inventoried the item retrieved from the defendant; he did not testify to what inventory number he assigned to the item. The State did not elicit any further testimony regarding the handling and safekeeping of the evidence, such as whether the evidence was sealed or secured in the plastic bag, whether the forensic scientist received a sealed bag, where the bag was kept before it was turned over to the State laboratory, or when the bag was turned over. In the absence of a stipulation to the sufficiency of the chain of custody, the court held that the State failed to establish that (1) reasonable protective measures were employed from the time the evidence was seized and (2) it was improbable that the evidence was altered. *Moore*, 335 Ill. App. 3d at 622.

¶ 43    *Moore* is distinguishable from this case in that Detective Mandernack testified that he received the evidence from Agent Shiu, transported it to the police station, sealed it in a plastic evidence bag, wrote his initials and identification number on the bag, and placed the bag in the evidence locker. Furthermore, Anderson testified that she received a sealed bag, which matched the description given by Detective Mandernack. In light of this evidence, the admission of the exhibit did not require a stipulation to a sufficient chain of custody, as the appellate court found to be necessary in *Moore*.

¶ 44    In *Howard*, there was testimony from the two police officers who originally packaged the suspected cocaine they seized from Howard. The officers, Gately and Wellbank, were members of the State Line Area Narcotics Team (SLANT) when they conducted the operation that resulted in Howard's arrest. Gately and Wellbank identified the State's exhibit as the package in which they had placed the suspected cocaine. Gately testified that the date, his initials, and his and Wellbank's badge numbers were on the package. Wellbank testified that the date, and his and Gately's initials, were on the package. Wellbank also testified that an " 'I.D. number' " was on the package, but Wellbank did not explain the nature of this number. *Howard*, 387 Ill. App. 3d at 1000. Gately and Wellbank also testified that the suspected cocaine weighed 53 grams on their portable scale, but they did not mention whether the weight was indicated on the package. *Howard*, 387 Ill. App. 3d at 998. There was testimony that the package changed hands several times, with a certain period unaccounted for, until it was received by the lab chemist, who found that the substance inside the package weighed 51.2 grams. *Howard*, 387 Ill. App. 3d at 1001.

¶ 45    We reversed the trial court's decision to admit the package, noting that there was no testimony that the package had a unique identifier. We held that "[t]he initials, badge numbers, date, and weight measurements fail[ed] *** as a matter of law" to show the improbability of tampering or accidental substitution. *Howard*, 387 Ill. App. 3d at 1006. We explained that the information on the package would have shown that accidental substitution was improbable only if it showed that it was improbable that the same officers would have handled another bag of white powder of similar weight on that day. *Howard*, 387 Ill. App. 3d at 1005. We reasoned that "[n]arcotics enforcement is SLANT's function, so we are not prepared to assume that two SLANT officers would not make two or more similar drug purchases in one day." *Howard*, 387 Ill. App. 3d at 1005.

¶ 46    In this case, a unique identifying number would be preferable to clearly show that there was no mistaken substitution, but to the extent that *Howard* holds that such an identifying number is required as a matter of law, we disavow that holding. To establish a *prima facie* showing of a chain of custody for narcotics, the State must establish that reasonable protective measures were taken and that it is unlikely that the evidence was substituted. A unique identifying number on the evidence is but one way of showing that reasonable protective measures were taken.

¶ 47    We conclude that the State established that the MEG agents took reasonable measures to protect the evidence once it was seized and that alteration was unlikely, which shifted the burden to defendant. *Blankenship*, 406 Ill. App. 3d at 594 ("We have found no authority to suggest that, in a drug case, the State must establish as part of its *prima facie* case that no drugs were seized by the same officers that day from anyone other than the defendant."). A defense theory that accidental substitution resulted from the agents making more than one drug purchase on the date of the arrest required proof from defendant that the agents made multiple drug purchases and that substitution actually occurred. Defendant presented no evidence of substitution, and he thus failed to rebut the State's *prima facie* showing of a sufficient chain of custody.

¶ 48    Defendant attempts to downplay *Blankenship*'s criticism of *Howard* by suggesting that his argument on appeal "rests not on the theoretical possibility that the baggie [he] gave [Agent] Shiu in the Mazda may have been mistakenly switched with a similar baggie obtained from someone else that same day, but rather on the real opportunity the police had to tamper with the baggie or to substitute another baggie in its place at various times before the evidence was actually tested at the lab." To the extent that defendant does not allege accidental substitution, *Howard* offers no support, as the State's failure to exclude the reasonable possibility of accidental substitution was the basis for the holding in that case. Here, once the State established its *prima facie* showing of a sufficient chain of custody and defendant failed to respond with evidence of actual tampering, alteration, or substitution, the jury was left to make a credibility determination regarding defendant's bald allegation that the MEG agents engaged in nefarious conduct.

¶ 49    We conclude that the trial court did not abuse its discretion in finding that the prosecution demonstrated that reasonable measures were employed to protect the evidence from the time it was placed in the evidence locker until it was tested. See *Woods*, 214 Ill. 2d at 467. Any deficiencies in the chain of custody affected the weight, not the admissibility, of the

-10-

evidence. *Woods*, 214 Ill. 2d at 467.

¶ 50                                B. Ineffective Assistance of Counsel

¶ 51        Defendant next argues that defense counsel rendered ineffective assistance. First, defendant argues that counsel should have objected to evidence that defendant had an outstanding arrest warrant at the time of the offense. Second, defendant argues that counsel should have objected to the State informing the jury that defendant's prior felony conviction was of unlawful possession of a controlled substance.

¶ 52        Both the United States and Illinois Constitutions guarantee a defendant the right to effective assistance of counsel. See U.S. Const., amend. VI; Ill. Const. 1970, art. I, § 8. The purpose of this guarantee is to ensure that the defendant receives a fair trial. *Strickland v. Washington*, 466 U.S. 668, 684-85 (1984); *People v. Pineda*, 373 Ill. App. 3d 113, 117 (2007). The ultimate focus of the inquiry is on the fundamental fairness of the challenged proceedings. *Strickland*, 466 U.S. at 696; *Pineda*, 373 Ill. App. 3d at 117. "However, there is a strong presumption of outcome reliability, so to prevail, a defendant must show that counsel's conduct 'so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.' " *Pineda*, 373 Ill. App. 3d at 117 (quoting *Strickland*, 466 U.S. at 686).

¶ 53        Claims of ineffective assistance of counsel are generally evaluated under the two-part test set forth in *Strickland*, 466 U.S. at 687, and adopted by our supreme court in *People v. Albanese*, 104 Ill. 2d 504, 525-26 (1984). *People v. Harris*, 225 Ill. 2d 1, 20 (2007). Under *Strickland*, defense counsel is ineffective only if (1) counsel's performance fell below an objective standard of reasonableness; and (2) counsel's error prejudiced the defendant. The failure to establish either prong is fatal to the claim. *Strickland*, 466 U.S. at 687; *Pineda*, 373 Ill. App. 3d at 117.

¶ 54        We assess counsel's performance using an objective standard of competence under prevailing professional norms. *People v. Ramsey*, 239 Ill. 2d 342, 433 (2010). To establish deficient performance, the defendant must overcome the strong presumption that counsel's action or inaction was the result of sound trial strategy. *Ramsey*, 239 Ill. 2d at 433. Counsel's strategic choices that are made after investigation of the law and the facts are virtually unassailable. *Ramsey*, 239 Ill. 2d at 433. The prejudice prong of the *Strickland* test can be satisfied if the defendant can show that counsel's deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair. *People v. Evans*, 209 Ill. 2d 194, 220 (2004).

¶ 55                                1. Outstanding Warrant, Criminal Record, and "Addiction"

¶ 56        Defendant contends that trial counsel was ineffective for failing to object to evidence that when he allegedly committed the charged offenses he was wanted on an outstanding warrant for an unspecified offense. When asked on direct examination to identify the target of the undercover operation on November 3, 2010, Agent Shiu named defendant and added that he had "a warrant for [defendant's] arrest out of McHenry County." Defense counsel did not object and, in fact, referred to the outstanding warrant on cross-examination of Agent Shiu.

-11-

Defendant asserts that counsel was ineffective and had "no legitimate reason" for allowing the jury to hear about the warrant.

¶ 57    In a related argument, defendant contends that counsel rendered ineffective assistance for making certain remarks during closing argument. Specifically, counsel reminded the jury that the police had an outstanding arrest warrant for defendant before Agent Shiu arranged the undercover transaction leading to the charges. Counsel also told the jury that the police knew defendant had a criminal record and was addicted to heroin. The trial court sustained the State's objection to the comment about addiction, as the jury had heard no such evidence.

¶ 58    We conclude that defense counsel's decisions were a matter of trial strategy. The State presented evidence that defendant was caught red-handed in a drug transaction with an undercover narcotics agent. Recognizing that identity was never an issue in the case, defense counsel pursued a strategy of challenging the chain of custody of the heroin and arguing that the agents framed defendant. We agree with the State that not objecting to the arrest warrant testimony and then commenting on the warrant, criminal record, and supposed "addiction" were part of defense counsel's trial strategy of portraying defendant as a victim of prosecutorial overreaching. Defense counsel's tactic was to argue that defendant was targeted, set up, and framed by narcotics agents who were trying to obtain the longest prison term possible. In fact, counsel argued to the jury that the police had "tricked this convicted felon into delivering heroin." Declining to object to the testimony about the warrant was consistent with the strategy, as counsel argued that the police should have simply executed the warrant rather than set up an elaborate heroin-for-gun transaction to get defendant into even more trouble.

¶ 59    Although defense counsel's decision to emphasize these points ultimately failed, counsel was not ineffective, because the decision was a matter of trial strategy. See *Ramsey*, 239 Ill. 2d at 433 (to establish deficient performance, a defendant must overcome the strong presumption that counsel's action or inaction was the result of sound trial strategy, and strategic choices made after investigation of the law and the facts are virtually unassailable).

¶ 60    Defendant argues on appeal that defense counsel's failure to present an entrapment defense rendered his trial strategy unreasonable. Under the defense of entrapment, a person is not guilty of an offense if "his or her conduct is incited or induced by a public officer or employee, or agent of either, for the purpose of obtaining evidence for the prosecution of that person. However, this Section is inapplicable if the person was pre-disposed to commit the offense and the public officer or employee, or agent of either, merely affords to that person the opportunity or facility for committing an offense." 720 ILCS 5/7-12 (West 2010). Hence, a defendant invoking an entrapment defense must present evidence that (1) the State induced or incited him to commit the crimes and (2) he lacked the predisposition to commit the crimes. *People v. Placek*, 184 Ill. 2d 370, 380-81 (1998). If the defendant presents some degree of evidence to support the entrapment defense, the burden shifts to the State to rebut that defense beyond a reasonable doubt. *Placek*, 184 Ill. 2d at 381.

¶ 61    "Predisposition is established by proof that the defendant was willing and able to commit the offense without persuasion before his initial exposure to government agents." *People v. Sanchez*, 388 Ill. App. 3d 467, 474 (2009). The following factors are relevant in assessing

predisposition in drug cases: " '(1) the defendant's initial reluctance or willingness to commit the crime; (2) the defendant's familiarity with drugs; (3) the defendant's willingness to accommodate the needs of drug users; (4) the defendant's willingness to profit from the offense; (5) the defendant's current or prior drug use; (6) the defendant's participation in cutting or testing the drugs; and (7) the defendant's ready access to a supply of drugs.' " *Sanchez*, 388 Ill. App. 3d at 474 (quoting *People v. Glenn*, 363 Ill. App. 3d 170, 173 (2006)). Before trial, defendant was adamant that he would not testify in his own defense, and thus he would have made it very difficult to establish that he was not predisposed to commit the offenses. Plus, even if defense counsel had presented some evidence to support the defense, the State would have had the opportunity to rebut the defense beyond a reasonable doubt with evidence on the predisposition factors.

¶ 62 Furthermore, " '[i]t is well established that one may not deny the commission of an offense and at the same time claim entrapment.' " *People v. Garmon*, 394 Ill. App. 3d 977, 988 (2009) (quoting *People v. Arriaga*, 92 Ill. App. 3d 951, 954 (1981)). In this case, invoking the entrapment defense would have required admitting all the elements of unlawful delivery of heroin, which would have precluded any challenge to the chain of custody of the drugs. Thus, counsel's decision not to invoke the entrapment defense was a strategic matter.

¶ 63 Assuming *arguendo* that defense counsel's strategy was objectively unreasonable, we nevertheless would conclude that defendant was not prejudiced by counsel's decision, because defendant cannot show that counsel's performance rendered the result of the trial unreliable or the proceeding fundamentally unfair. See *Evans*, 209 Ill. 2d at 220. The result of the trial would not have been different, as the evidence of defendant's guilt was overwhelming and defense counsel's decision to embrace the State's depiction of defendant as a drug user with a criminal history already portrayed him as a victim.

¶ 64                                 2. Drug-Related Nature of Prior Conviction

¶ 65 Defendant also argues that trial counsel was ineffective for failing to take steps to prevent the jury from learning that his prior felony conviction was of unlawful possession of a controlled substance. Defendant argues that he was prejudiced by the jury learning that his prior conviction was drug-related. Defendant asserts that counsel should have moved to sever the charges or at least should have asked the court to "sanitize" the evidence by disclosing only that defendant had been convicted of an unspecified felony, without disclosing that it was for possessing drugs. We conclude that a motion for severance would have lacked merit and that therefore counsel was not ineffective for failing to file one. We also conclude that, although defendant would have been entitled to a stipulation of his felon status had counsel presented one (see *People v. Walker*, 211 Ill. 2d 317 (2004)), counsel's decision not to do so was a matter of trial strategy.

¶ 66                                                a. Severance

¶ 67 The charges of unlawful delivery of less than one gram of heroin and attempted unlawful possession of a firearm by a felon were charged in a single indictment and tried before one jury. Defendant contends that he was prejudiced by counsel's failure to move to sever the

-13-

charges. For the following reasons, a motion to sever would have lacked merit.

¶ 68    A court may order two or more charges to be tried together "if the offenses *** could have been joined in a single charge." 725 ILCS 5/114-7 (West 2010). "Two or more offenses may be charged in the same [charging instrument] in a separate count for each offense if the offenses charged *** are based on the same act or on 2 or more acts which are part of the same comprehensive transaction" (725 ILCS 5/111-4(a) (West 2010)), unless it appears that the defendant will be prejudiced by joinder of the separate charges (725 ILCS 5/114-8 (West 2010)). *People v. Walston*, 386 Ill. App. 3d 598, 601 (2008). A trial court has substantial discretion in deciding whether to sever separate charges, and its decision will not be reversed on appeal absent an abuse of that discretion. *Walston*, 386 Ill. App. 3d at 600.

¶ 69    A number of factors affect whether two or more crimes are part of the "same comprehensive transaction" so as to be susceptible to joinder. The factors routinely are described as (1) "the proximity in time and location of the offenses"; (2) "the identity of evidence needed to demonstrate a link between the offenses"; (3) "whether there was a common method in the offenses"; and (4) "whether the same or similar evidence would establish the elements of the offenses." (Internal quotation marks omitted.) *Walston*, 386 Ill. App. 3d at 601 (quoting *People v. Gapski*, 283 Ill. App. 3d 937, 942 (1996)).

¶ 70    First, "the proximity in time and location of the offenses," the most helpful factor by far, asks whether the offenses to be joined were close in time and location. As events become separated by time and distance, the likelihood decreases that they may be considered part of the same comprehensive transaction as is required by the statute. *Walston*, 386 Ill. App. 3d at 603. "[N]o matter how similar two incidents are, incidents not occurring within a very close time and space to one another will most likely be separate incidents." *Walston*, 386 Ill. App. 3d at 605. In this case, the factor of proximity in time and location weighs heavily in favor of joinder. The State presented evidence that the unlawful delivery of heroin and the attempted unlawful possession of a firearm occurred at the same time and place: inside Agent Shiu's car at 8:45 p.m. on November 3, 2010.

¶ 71    Second, "the identity of evidence needed to demonstrate a link between the offenses" is a factor that asks "not whether evidence of the two crimes is similar or identical but rather whether the court can identify evidence linking the crimes." (Emphases omitted.) *Walston*, 386 Ill. App. 3d at 605. For example, in *People v. Quiroz*, 257 Ill. App. 3d 576 (1993), the appellate court noted that there was evidence linking two shootings to the defendant's alleged armed robbery during his escape: during the time between the two sets of crimes, as he fled the scene of the shootings, the defendant had attempted to gain entrance into the home of a fellow gang member. *Quiroz*, 257 Ill. App. 3d at 586. The defendant's intervening attempt to hide in the house linked his crimes of shooting two people and stealing a car to escape. *Quiroz*, 257 Ill. App. 3d at 586. In this case, the offenses of unlawful delivery of heroin and attempted unlawful possession of a firearm share much of the same evidence. For example, the offenses are linked by evidence of the planning, negotiation, and other communication between Agent Shiu and defendant; the meeting where the exchange took place; and defendant's arrest.

¶ 72    Third, the "common method" factor in the joinder analysis asks whether the offenses

-14-

were part of a "common scheme," so that each of the offenses supplies a piece of a larger criminal endeavor of which the crime charged is only a portion. *Walston*, 386 Ill. App. 3d at 606-07 (citing *Quiroz*, 257 Ill. App. 3d at 586 (three crimes were part of a common scheme where the last crime was committed in an attempt to flee the scene of the first two)). In this case, Agent Shiu testified that his interaction with defendant was based on a plan by which defendant would deliver heroin in exchange for a pistol. The two crimes were part of a common scheme.

¶ 73    Fourth, the question of " 'whether the same or similar evidence would establish the elements of the offenses' " may be considered in the joinder analysis, but only if it is used to determine whether multiple offenses are part of a single comprehensive transaction. *Walston*, 386 Ill. App. 3d at 607 (quoting *Gapski*, 283 Ill. App. 3d at 942). In this case, defendant's status as a felon and his attempted acquisition of the pistol, which are the elements of the weapons charge, share no commonality with the elements of unlawful delivery of less than one gram of heroin.

¶ 74    Although the "elements of the offenses" factor weighs in favor of severance, the other factors weigh heavily against it. The proximity in time and location, the identity of evidence linking the offenses, and the common method in the offenses establish that severance of the charges was inappropriate in this case. Because a motion for severance would have lacked merit, defense counsel's failure to seek one was not error and defendant was not prejudiced by counsel's omission. *Cf. People v. Easley*, 192 Ill. 2d 307, 329 (2000) ("Appellate counsel is not obligated to brief every conceivable issue on appeal, and it is not incompetence of counsel to refrain from raising issues which, in his or her judgment, are without merit, unless counsel's appraisal of the merits is patently wrong. Accordingly, unless the underlying issues are meritorious, defendant has suffered no prejudice from counsel's failure to raise them on appeal.").

¶ 75                    b. "Sanitizing" Evidence

¶ 76    Defendant next argues that he is entitled to a new trial on the heroin charge because defense counsel was ineffective for failing to "sanitize" the evidence of his prior conviction of unlawful possession of a controlled substance. Defendant contends that he was unfairly prejudiced by the trial court allowing the State to elicit testimony regarding the name and nature of his prior conviction. Defendant argues that counsel should have offered a stipulation that defendant had an unspecified prior conviction, described only as a "felony" or a "non-violent felony." Defendant also argues that counsel should have offered a jury instruction that similarly omitted the drug-related nature of his prior conviction. We disagree with defendant that counsel's omissions were ineffective assistance.

¶ 77    Defendant cites *Walker* for the proposition that the trial court would have been obligated to bar the disclosure of the nature of defendant's prior felony conviction if counsel had made a request to do so. In *Walker*, the defendant was convicted of possession of a weapon by a felon, and the issue on appeal was whether the trial court abused its discretion by allowing the prosecution to present evidence of the name and nature of the defendant's prior conviction when a stipulation was available. *Walker*, 211 Ill. 2d at 320. Our supreme court

-15-

held that "where the prosecution's sole purpose for introducing evidence of a defendant's prior felony conviction is to prove his status as a convicted felon and the defendant offers to stipulate to this element, the probative value of the name and nature of the prior conviction is outweighed by the risk of unfair prejudice and, thus, should be excluded." *Walker*, 211 Ill. 2d at 341. The court reasoned that, in a prosecution requiring proof of felon status, the admission of the defendant's record of convictions creates a risk that he will be unfairly prejudiced because "the name and nature of the prior convictions is unnecessary surplusage without any evidentiary significance." *Walker*, 211 Ill. 2d at 338. The court held that "when proving felon status is the only purpose for admitting evidence of a defendant's prior convictions, and the defendant offers to stipulate or admit to his prior felon status, a trial court abuses its discretion when it admits the defendant's record of conviction, thus informing the jury of the name and nature of the defendant's prior convictions." *Walker*, 211 Ill. 2d at 338.

¶ 78    Although defendant would have been entitled to a stipulation to his felon status, the record shows that defense counsel's decision to eschew such a stipulation was a matter of trial strategy. As discussed, the State presented evidence that defendant was caught red-handed in a heroin-for-gun transaction with an undercover narcotics agent. Part of defense counsel's strategy was to argue that the agents framed defendant, who they knew had a history of drug-related criminality. Declining to object to the testimony about the name and nature of defendant's prior felony conviction and allowing the jury to hear that the conviction was of unlawful possession of a controlled substance was consistent with defense counsel's trial strategy of portraying defendant as a vulnerable victim of the police.

¶ 79    Although defense counsel's decision not to seek a stipulation to defendant's felon status ultimately failed, counsel was not ineffective, because the decision was a matter of trial strategy. See *Ramsey*, 239 Ill. 2d at 433 (to establish deficient performance, a defendant must overcome the strong presumption that counsel's action or inaction was the result of sound trial strategy and strategic choices made after investigation of the law and the facts are virtually unassailable).

¶ 80    We also reject the notion that defense counsel was ineffective for failing to object to the State's jury instruction that disclosed the name and nature of his prior felony. The purpose of jury instructions is to provide the jurors with the legal principles that apply to the evidence so they can reach a correct verdict. *People v. Hopp*, 209 Ill. 2d 1, 8 (2004). "Jury instructions should not be misleading or confusing." *People v. Pinkney*, 322 Ill. App. 3d 707, 717 (2000). "[T]here must be sufficient evidence in the record to support an instruction, lest the jury be confused by issues improperly before it." *Pinkney*, 322 Ill. App. 3d at 717.

¶ 81    Illinois Supreme Court Rule 451(a) (eff. July 1, 2006) provides that whenever the Illinois Pattern Jury Instructions (IPI) contain an applicable jury instruction, and the court determines that the jury should be instructed on the subject after giving due consideration to the facts and the law, "the [IPI instruction] *shall* be used[ ] unless the court determines that it does not accurately state the law." (Emphasis added.) Where there is no IPI instruction on a subject on which the court determines the jury should be instructed, the court has the discretion to give a nonpattern instruction. *People v. Ramey*, 151 Ill. 2d 498, 536 (1992). The court's decision on whether to use a non-IPI instruction should not be disturbed absent an abuse of

that discretion. *People v. Pollock*, 202 Ill. 2d 189, 211 (2002). Whether the court has abused its discretion in giving a particular instruction will depend on whether it was an accurate, simple, brief, impartial, and nonargumentative statement of the applicable law. Ill. S. Ct. R. 451(a) (eff. July 1, 2006); *Pollock*, 202 Ill. 2d at 211.

¶ 82 In this case, the trial court used the State's proposed instruction, which was based on Illinois Pattern Jury Instructions, Criminal, No. 18.07 (4th ed. 2000) (hereinafter, IPI Criminal 4th). The instruction stated, "A person commits the offense of unlawful possession of a firearm by a felon when he, having been previously convicted of the offense of unlawful possession of a controlled substance, knowingly possesses on or about his person a firearm."

¶ 83 The trial court determined that IPI Criminal 4th No. 18.07 applied to the evidence; and, in turn, Rule 451(a) mandates that an applicable pattern instruction be used. However, *Walker* instructs that IPI Criminal 4th No. 18.07 should be modified to omit the name and nature of the prior felony in cases where the defense requests a stipulation to the accused's felon status. Accordingly, defendant asserts, trial counsel was ineffective for failing to ask the court to depart from the pattern instruction. A motion advocating such a departure should have been granted, but counsel's decision not to request a stipulation and a corresponding modification of the instruction was a matter of trial strategy. The pattern instruction specifically naming the drug-related prior felony highlighted counsel's point that the narcotics agents knew that defendant had a history of drug possession and thus was susceptible to being "tricked" into a criminal transaction. Counsel's decision not to stipulate to defendant's felon status and ask for a modified instruction ultimately failed, but the decision was a matter of trial strategy. See *Ramsey*, 239 Ill. 2d at 433. Thus, counsel was not ineffective for failing to offer the stipulation and to propose a modified instruction.

¶ 84 Furthermore, defendant was not prejudiced by defense counsel's decision not to attempt to sanitize the evidence of his prior conviction of unlawful possession of a controlled substance. Defendant cannot show that counsel's performance rendered the result of the trial unreliable or the proceeding fundamentally unfair. See *Evans*, 209 Ill. 2d at 220. We again emphasize that the result of the trial would not have been different even if counsel had taken steps to withhold from the jury the nature of defendant's prior conviction. In fact, counsel's attempt to portray defendant as a vulnerable target of the police would have been *less* credible without the evidence of the nature of his criminal history. Without the disclosure of the nature of the prior conviction, the State could have argued that the police simply do not target law-abiding citizens with no history of drug use. The depiction of defendant as a drug user helped portray him as a victim.

¶ 85 III. CONCLUSION

¶ 86 For the reasons stated, the judgment of the circuit court of McHenry County is affirmed.

¶ 87 Affirmed.